## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DANA O'NEAL,

               Plaintiff,                                Case No. 22-cv-10470

v.                                           Hon. Victoria A. Roberts

52ND DISTRICT COURT and
JUDGE JOSEPH G. FABRIZIO,
in his personal and official capacity,

               Defendants.

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Aaron C. Thomas (P55114) |
| Grant M. Vlahopoulos (P85633) | Oakland County Deputy Corp Counsel |
| HURWITZ LAW PLLC | Nicole B. Tabin (P73685) |
| *Attorneys for Plaintiff* | Sr. Asst. Oakland County Corp Counsel |
| 617 Detroit St. STE 125 | *Attorneys for Defendants* |
| Ann Arbor, MI 48104 | 1200 N. Telegraph Road, Dept. 419 |
| (844) 487-9489 | Pontiac, MI 48341-0419 |
| noah@hurwitzlaw.com | (248) 975-9616 |
| grant@hurwitzlaw.com | (248) 858-1475 |
| | thomasa@oakgov.com |
| | tabinn@oakgov.com |

There is no other pending or resolved civil action arising out
of this transaction or occurrence alleged in the Complaint.

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

     Plaintiff DANA O'NEAL, by and through her attorneys, HURWITZ LAW

PLLC, brings this action against Defendants 52nd District Court and Chief Judge

Joseph G. Fabrizio, and hereby alleges as follows:

## INTRODUCTION

1.     Plaintiff Dana O'Neal ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 (First Amendment Retaliation) and Michigan's Whistleblower Protection Act ("WPA"), MCL § 15.362, *et seq*., seeking equitable, declaratory, and monetary damages against Defendants 52nd District Court ("Defendant 52nd District Court") and Chief Judge Joseph G. Fabrizio ("Defendant Fabrizio"). Plaintiff was terminated on December 10, 2021 for speaking out against the professional misconduct of District Court Judge Kirsten Hartig ("Judge Hartig"), which generated an official investigation with the Judicial Tenure Committee ("JTC") at the recommendation of the State Court Administrative Office ("SCAO"), and then participating in the JTC investigation.  Plaintiff's speech was regarding a matter of public concern, and her involvement with the SCAO and JTC investigation constitutes protected activity.   Her sudden termination without justification after a career of distinguished public service for over 25 years was proximately caused by her speech and involvement in the JTC investigation and violated the First Amendment to the United States Constitution and the WPA.

## PARTIES AND JURISDICTION

6.     Plaintiff is a resident of West Bloomfield, Michigan, which is in Oakland County.

7.     Defendant 52nd District Court is a governmental body established by the Michigan Legislature and is in Oakland County.

8.     Defendant Judge Joseph G. Fabrizio is the Chief Judge of Defendant 52nd District Court.

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(4) (jurisdiction over civil rights claims).

10.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claim.

11.     Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391, as it is the district where the Defendant's principal place of business is located and where the events giving rise to Plaintiff's claims took place.

12.     Plaintiff sues Defendant Fabrizio in both his individual and official capacity.

13.     At all times material to this Complaint, Defendant Fabrizio acted under color of law, meaning under color of the statutes, codes, ordinances, regulations, policies, customs and usages of the State of Michigan and/or 52nd District Court.

## FACTUAL ALLEGATIONS

14.     The Oakland County 52nd District Court is divided into four (4) divisions.  MCL 600.8123(9)(a-d).

15.     Plaintiff began her career in public service in 1992 as an intern at the Oakland County 52-2 District Court, which consists of the Village of Clarkston and the townships of Springfield, Independence, Holly, Groveland, Brandon, Rose, and White Lake.  MCL 600.8123(9)(b).

16.     Plaintiff was quickly promoted to a contractual worker responsible for overseeing the day-to-day operations of the Probation Department and managing large caseloads.

17.     In 1996, Plaintiff was hired by the Oakland County Community Corrections Department and tasked with high level administrative duties, including the establishment of new programs within the Department.

18.     In 2002, the Oakland County Community Corrections Department promoted Plaintiff to supervisor.  She flourished in the role and earned local, state and national-level recognition for her accomplishments.

19.     In April 2018, Plaintiff was hired as the Court Administrator at the Oakland County 52-4 District Court.

20.    The fourth division of the Oakland County 52nd District Court consists of the cities of Troy and Clawson and has two judges: Judge Hartig and Judge Maureen McGinnis ("Judge McGinnis").  MCL 600.8123(9)(d).

21.    During the hiring process, Plaintiff was vetted by two other court administrators and Defendant Fabrizio.

22.    Defendant Fabrizio is the Chief Judge of the Oakland County 52-2 District Court.

23.    Upon information and belief, during the eight years prior to Plaintiff's arrival, former court administrators working at the Oakland County 52-4 District Court abandoned their respective positions due to Judge Hartig's mistreatment of staff and the public.

24.    Judge Hartig was elected to the bench as a District Court Judge in 2010.

25.    One of Plaintiff's predecessors resigned within six weeks of Judge Hartig assuming the bench.

26.    Another predecessor retired after alleging a hostile work environment, which triggered an investigation by Defendant 52nd District Court's Human Resources Department ("Human Resources") in 2016.

27.    The investigation resulted in Human Resources claiming it could not control Judge Hartig's behavior and required staff to take a mandatory training entitled "How to Deal with Difficult People."

28.    During Plaintiff's tenure at the Oakland County 52-4 District Court, she led efforts to recruit and retain staff for the County, improved operations and building securities, increased staff morale, remedied labor deficiencies, solved a black mold issue, and implemented COVID-19 safety policies and procedures.

29.    However, Judge Hartig exerted inappropriate control over court administration, thereby usurping Plaintiff's supposedly autonomous role.

30.    Judge Hartig forced Plaintiff to attend daily closed-door meetings, where she regularly berated her and claimed that she was "above" her.

31.    Plaintiff witnessed Judge Hartig mistreat other staff and members of the public from the outset of her employment.

32.    Judge Hartig displayed a pattern or practice of demeaning and belittling others.  Plaintiff received multiple complaints from court appointed counsel, took statements, and watched video recordings of Judge Hartig's conduct.

33.    Plaintiff contemporaneously maintained notes on Judge Hartig's impropriety towards Plaintiff, county employees, and members of the public.

34.    Plaintiff stored these records in her office.

35.     Approximately one month into her employment, Plaintiff was hospitalized with severe diverticulitis for three days—a condition she never suffered before.

36.     Plaintiff worked through illness to avoid reprisal.

37.     Plaintiff continued to endure mistreatment that exacerbated her mental and physical health contributing to multiple stress-related medical conditions including diverticulitis, hair loss, weight loss, and the diagnosis of Type 2 diabetes.

38.     On or about May 22, 2018, the day Plaintiff returned to work from a medical absence, she was summoned to meet with both Judge Hartig and Judge McGinnis.

39.     Judge Hartig ordered, "unless you are unconscious, you are to check in with me daily."  Judge McGinnis did not interfere.

40.     Judge Hartig also told Plaintiff about a new "Court Administrator Absence Policy," designed by Judge Hartig to limit Plaintiff's medical leave.

41.     Plaintiff forwarded an electronic copy of the policy to Defendant Fabrizio and to an Oakland County 52-1 District Court Administrator, who responded, "[I]s this [expletive] for real?"

42.     Judge Hartig was intrusive with Plaintiff, forcing her to report to Judge Hartig or other court staff any time she used the restroom.

43.    In September 2018, Judge Hartig hailed Plaintiff to open court to accuse her of mismanaging grant funding.  A full court room watched Judge Hartig publicly humiliate Plaintiff.

44.    Plaintiff reported the incident to Defendant Fabrizio, who escalated the matter to SCAO, including both a transcript and video recording of the September 2018 incident.

45.    For the next two years, Judge Hartig continued to interfere with the discipline and morale in the Oakland County 52-4 District Court, which effects the public's confidence in the judiciary.

46.    In March 2020, Plaintiff emailed Defendant Fabrizio detailed examples of Judge Hartig's mistreatment of Plaintiff and other governmental employees.

47.    Defendant Fabrizio deferred Plaintiff to Human Resources; it launched an internal investigation.

48.    Human Resources interviewed Plaintiff for three hours about Judge Hartig.

49.    At the conclusion of its investigation, Human Resources created a report containing its findings on Judge Hartig's conduct that was based in whole or in part on Plaintiff's speech.

50.    Defendants prevented Plaintiff from acquiring or reviewing the Human Resource's report.  Instead, only Defendant Fabrizio received it.

51.    Plaintiff asked Defendant Fabrizio for a copy of the Human Resources report, but he never provided one.

52.    However, Human Resources staff told Plaintiff that Judge Hartig's behavior fostered a "hostile work environment."

53.    Human Resources' findings were severe enough that it recommended Defendant Fabrizio to forward the report to the JTC and submit a request for investigation.

54.    The JTC is the arm of Michigan's judicial branch created pursuant to Mich. Const. Art VI, Sec. 30 to investigate allegations of judicial misconduct.  JTC proceedings are initiated when a person submits a "Request for Investigation" to the JTC.  MCR 9.220(A).  The JTC then investigates and decides to either dismiss the matter or institute a formal complaint if there is sufficient evidence to believe that the judge under investigation "has engaged in misconduct."  MCR 9.223; MCR 9.224.

55.    MCR 9.202(B)(1) defines misconduct as: (a) persistent incompetence in the performance of judicial duties; (b) persistent neglect in the timely performance of judicial duties; (c) persistent failure to treat persons fairly and courteously; (d) treatment of a person unfairly or discourteously because of the

persons' race, gender, or other protected personal characteristic; (e) misuse of judicial office for personal advantage or gain, or for the advantage or gain of another; and (f) failure to cooperate with a reasonable request made by the commission in its investigation of a respondent.

56.     On June 5, 2020, Defendant Fabrizio executed Administrative Order 2020-04, which restricted the public's "requests for access, inspection, and reproduction of public court case records" by ordering the clerk to "not permit any case records to be taken from the court without the order of the court" with only limited exceptions. Administrative Order 2020-04.

57.     Administrative Order 2020-04 prohibits members of the public from accessing or receiving copies of court recordings, log notes, jury seating charts, and other media with limited exceptions. This includes video/audio/digital court recordings, notes, tapes, logs, backup tapes, discs, and any other medium used or created in the making of a record of proceedings and kept pursuant to MCR 8.108. Administrative Order 2020-04.

58.     On July 30, 2020, approximately one month after Administrative Order 2020-04 was issued, the JTC's Executive Director and General Counsel, Lynn A. Helland, sent Defendant Fabrizio an official letter acknowledging receipt of his Request for Investigation.

59.     Accordingly, the JTC initiated an investigation into whether Judge Hartig engaged in misconduct, as defined by MCR 9.202(B)(1), that was based in whole or in part on Plaintiff's speech and public concerns.

60.     The "General Summary" of Plaintiff's job description provides:

> Under general direction, is responsible for the *administrative and non-judicial functions* of one division of the 52nd District Court involving the management of case processing, personnel, budget, juries, facilities, security and other non-judicial functions.  Directs the processing of traffic, civil, criminal and probation case flow.  Reviews and implements new court rules, statues, administrative orders and laws affecting case processing, technical and personnel matters.  Utilizes current county-wide and/or department specific software to complete assignments.

61.     Plaintiff's speech was unrelated to the management, operation, or general business administration of Defendant 52nd District Court.  Rather, it focused on the attributes of an elected official entrusted by the citizens of Troy and Clawson to execute the judicial functions of the Oakland County 52-4 District Court.

62.     Plaintiff's speech brought to light the potential or actual wrongdoings or a breach of the public trust in Defendant 52nd District Court and in Defendant Fabrizio as its chief judge.

63.     Plaintiff's speech touched on the public concern of judicial fitness. "Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges."  MI. Code of Judicial Conduct, Canon 2(A).

64.     Plaintiff did not, nor could she, gain any personal advantages by asserting her speech.

65.     Plaintiff's job description and her essential functions do not involve the responsibility to curtail a judge's behavior.

66.     Plaintiff's job description and her essential functions are facially void of any references to "investigate;" "misconduct;" or "discipline."

67.     Plaintiff's position as court administrator inherently lacks authority to investigate or discipline an elected judge for alleged misconduct.

68.     Plaintiff's speech cannot be attributed to the ordinary scope of her duties as court administrator when considering the reasons for the speech, the setting of the speech, the speech's audience, and the general subject matter.  Nor can Plaintiff's speech be read into her job description as an *ad hoc* or *de facto* duty.

69.     Plaintiff's speech and involvement in the JTC investigation was not a run-of-the-mill employment dispute.

70.     The public's tax dollars pay, in part, for JTC investigations.

71.     Plaintiff cooperated with the JTC investigation, and she emailed JTC Investigator Glenn Page periodically for updates.

72.     Plaintiff provided the JTC with names of individuals to be interviewed and assisted with the logistical details for the JTC interviews.

73.     In November 2020, the JTC interviewed current and former County employees, local law enforcement and local attorneys.

74.     Upon information and belief, the JTC investigator interviewed a minimum of 40-60 people on subjects that were more far-reaching than just the treatment of Plaintiff.

75.     In early 2021, Defendant Fabrizio began to distance himself from Plaintiff.  He instructed Court Administrator Alex Black to call Plaintiff and tell her to stop contacting Defendant Fabrizio because he did not know "why or how to assist" Plaintiff.

76.     Plaintiff questioned why Defendant Fabrizio would not contact her personally and Ms. Black claimed that Defendant Fabrizio did not want to "upset" Plaintiff.

77.     In or about September 2021, Mr. Page informed Plaintiff that evidence against Judge Hartig was being compiled in a report that was being elevated to Mr. Page's supervisor.

78.     Upon information and belief, the JTC investigation is still ongoing.

79.     On September 13, 2021, Plaintiff was called to a meeting with Judge McGinnis and Defendant Fabrizio.   Plaintiff was not provided with any information about the meeting in advance.

80.     During the meeting, Defendant Fabrizio asked Plaintiff whether someone within the court was contacting potential candidates to tell them "how bad it was" working for Defendant 52nd District Court.

81.     Defendant Fabrizio was aware that staffing shortages ravaged the entire 52nd District Court and all Michigan courts.   "The Courts were more negatively impacted because they had limited personnel to spare and rotate schedules.   This created a domino effect, resulting in delays in scheduling and hearing management."     State Ct. Admin. Off. Lessons Learned Comm., MICHIGAN TRIAL COURTS: LESSONS LEARNED FROM THE PANDEMIC OF 2020-2021, at 20 (Nov. 19, 2021).

82.     Moreover, not exclusive to the 52-4 District Court, the percentage of case filings in the entire state of Michigan has grown since the COVID-19 pandemic.   SCOA released a Trial Court Backlogs Backgrounder in March 2021 comparing Michigan data from the end of 2019 to the end of 2020.   It found that by "[l]ooking at the growth in pending non-criminal (civil, juvenile, domestic relations) cases, the increase is roughly 14 percent [at the district level] to 18 percent [at the circuit/probate level]."   Mich. Sup. Ct. State Ct. Admin. Off., Trial

Court Backlogs Backgrounder, March 2021, at 1 (Mar. 2021). SCAO cautioned that "the number of case filings in civil, domestic relations, and dependency is expected to surge and may pose a significant challenge to courts *in 2021 and beyond*." *Id* at 2.

83.    Staffing shortages caused by the COVID-19 pandemic, coupled with an increase in case filings, resulted in chronic backlogs and delays across Michigan.   SCAO advises that backlog is a "nationwide problem," and that "Michigan is not alone in having to tackle substantial backlog of pending cases as a result of the pandemic." *Id*.   In 2020, courts in the State of Michigan reached "only 592 jury verdicts compared to 2,155 jury verdicts in 2019." *Id*.

84.    Plaintiff mitigated the issues by hiring new employees and instilling cross-training programs, where employees from other departments and/or divisions of Defendant 52nd District could fill any openings when help was required.

85.    Plaintiff's implementation of COVID-19 safety criteria was shared with other court administrators as a model example to replicate.

86.    Plaintiff did her best to solve the administrative issues posed by the COVID-19 pandemic that crippled *all* Michigan courts. "Judge James Alexander, Oakland County Circuit Court (now retired), best summarized the Michigan trials courts' level of preparedness for the pandemic and initial shutdown orders: 'Anyone who tells you they were prepared for this is either lying or living in Oz!'"

State Ct. Admin. Off. Lessons Learned Comm., MICHIGAN TRIAL COURTS: LESSONS LEARNED FROM THE PANDEMIC OF 2020-2021, at 6 (Nov. 19, 2021).

87.     Defendants never indicated that Plaintiff's performance as court administrator fell below standards during this time.

88.     Meanwhile, Plaintiff's speech was echoed by the public, and residents of Oakland County recognized that Defendant 52nd District Court is "rife with judicial abuse and misconduct."  On June 8, 2021, a resident of Oakland County, Samantha Hallman, Ph.D., appeared before the Oakland County Board of Commissioners Public Health and Safety Committee.  Dr. Hallman was granted three minutes to make an official public comment on record.  Dr. Hallman used her time to warn, in pertinent part:

> There has been a pattern of abuse from [Defendant 52nd District Court] for years and that it is well known in the legal community.  However, it is not well known among the general public who votes for these judges and pays for these courts because of judicial orders in place that are designed to prevent the public from accessing copies of audio and video files that would let them see and hear for themselves what's been going on for years. Currently, [Defendant] Fabrizio has ordered 2020-04 in place, which expressly forbids his staff from sharing copies of audio and video files of public hearings with the public.

89.     On December 10, 2021, Defendants abruptly terminated Plaintiff while the JTC investigation remained open.

90.     Plaintiff's protected speech concerning Judge Hartig's conduct and involvement in the JTC investigation was a substantial or motivating factor in Defendants' decision to terminate her.

91.     Plaintiff's protected speech bringing to light the potential or actual wrongdoings or a breach of the public trust in Defendants was a substantial or motivating factor in Defendant's decision to terminate her.

92.     No justification was otherwise provided.   There was no formal negative performance evaluation, corrective action, employee assistance program—all of which are customary prior to termination.

93.     Defendant's purported reasoning for terminating Plaintiff remained a mystery while she was escorted by law enforcement off the premises without any of her belongings.

94.     Thereafter, Defendant placed some of Plaintiff's property outside of the courthouse for her to pick up, but Plaintiff soon realized that the notes stored in her office detailing Judge Hartig's behavior and the investigations were missing.

95.     The November 2022 Michigan general election marks the first time since Judge Hartig was elected to the bench that her seat is being opposed by other candidates.

**COUNT I**
**42 USC § 1983**
**First Amendment Retaliation**

96.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

97.     The First Amendment of the United States Constitution, as incorporated into the 14th Amendment, prevents governments from abridging an individual's freedom of speech.

98.     The First Amendment also protects an individual from retaliation when she has exercised her freedom of speech.

99.     The rationale for protecting a public employee's right to comment on matters of public concern is that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." *City of San Diego, v. Roe*, 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004).

100.    An employee speaking as a citizen is speaking on a matter of public concern when that speech can be fairly considered as relating to any matter of political, social, or other concern to the community.   Another consideration is whether the speech involves a subject of general interest and of value and concern to the public.  *Mosholder v. Barnhardt*, 679 F.3d 443, 449 (6th Cir. 2012).

101.   Speech entails a matter of public concern when the speech involves issues for which information is needed to enable members of society to make informed decisions regarding their government's operation.  *Banks v. Wolfe Co. Bd. of Ed.*, 330 F.3d 888, 892 (6th Cir. 2003).

102.   "Public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."  Id. at 83-84.

103.   "When a public employee speaks on a matter that is merely related to the employee's profession, he or she is a member of the community most likely to have an informed and definite opinion and must be permitted to speak freely absent fear of retaliation*." Garvin v. Detroit Bd. of Educ.*, No. 298838, 2013 WL 951118, at \*11 (Mich. Ct. App. Feb. 26, 2013), citing *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

104.   Plaintiff's speech was made as a citizen on a matter of public concern.

105.   Bringing to light potential or actual wrongdoings or a breach of the public trust are generally matters of public concern.  *Connick v. Myers*, 461 U.S. 138, 148, 103 S. Ct. 1684, 1691, 75 L. Ed. 2d 708 (1983).  Moreover, "discipline and morale in the workplace are related to an agency's efficient performance of its duties[.]"  *Id.*

106.   An investigation launched by the JTC into Defendants' conduct and the extent and adequacy of the measures taken by public officials in response to the allegations involve matters of social concern to the community, a potential breach of the public trust, the general public interest, and entail matters upon which information is needed to enable members of society to make informed decisions regarding the leadership and operations of elected officials, including Defendant 52nd District Court's judges.

107.   Defendants punished Plaintiff for raising matters of public concern.

108.   Defendants terminated Plaintiff for speaking out about how a court official mistreats members of the public.

109.   Defendants' decision to terminate Plaintiff was motivated, at least in part, by Plaintiff's exercise of her First Amendment right to free speech.

110.   Plaintiff's interest as a citizen in speaking on these matters was significant, as they concerned substantial matters of ethics and public safety that she was well informed of and entitled to make.

111.   Plaintiff's speech had no impact on the efficiency of the Court, and therefore Defendants had no interest in curtailing this speech to promote the efficiency of the public services they performed through their employees.

112.   Defendants acted with deliberate indifference to Plaintiff's presumed and actual innocence.

113.   Defendants agreed to, approved, and ratified this unconstitutional conduct.

114.   It would have been plainly obvious to a reasonable official that such actions or inaction would deprive or lead to the deprivation of Plaintiff's constitutional rights.

115.   Defendants' actions and inaction, as set forth above, were fundamentally unfair to Plaintiff.

116.   There exists no rational relationship between Plaintiff's actual conduct and the discipline imposed against her by Defendants.

117.   As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered emotional and physical distress, feelings of depression, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

118.   As a further and direct proximate result of Defendants' retaliation, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and ability to work in the future.

### COUNT II
### MCL § 15.361, *et seq.*
### <u>MICHIGAN'S WHITLEBLOWER'S PROTECTION ACT</u>

119.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

120.   At all relevant times, Defendants were an employer and Plaintiff was an employee covered by and within the meaning of the WPA, MCL § 15.361, *et seq*.

121.   Defendants and the JTC are public bodies within the meaning of the WPA, MCL § 15.361, *et seq*.

122.   MCL § 15.362 protects an employee who is "requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action."   The express language of the statute does not limit that protection to investigations of a violation of law; "it does not matter whether the investigation involves a violation of law, regulation or rule." *Housey v. Macomb Cty. Prob. Ct*., No. 309060, 2014 WL 1383347, at *1 (Mich. Ct. App. Apr. 8, 2014)

123.   Plaintiff engaged in protected activity under MCL § 15.362 because she cooperated with the SCAO and participated in an investigation held by the JTC.

124.   Defendants retaliated against Plaintiff because of her protected activity in violation of the WPA by, *inter alia*, terminating her from her employment.

125.   As a direct and proximate result of Defendants' violation of the WPA, Plaintiff has suffered emotional and physical distress, feelings of depression, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

126.   As a further and direct proximate result of Defendants' retaliation, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and ability to work in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dana O'Neal requests the following relief from this Court against Defendants:

a.   Declare that the aforementioned practices and actions of Defendants constitute an unlawful violation of 42 U.S.C. § 1983;

b.   Declare that the aforementioned practices and actions of Defendants constitute an unlawful violation of Michigan's Whistleblower Protection Act, MCL 15.362, *et seq*.;

c.   Award Plaintiff compensatory, economic, and noneconomic damages in whatever amount Plaintiff is found to be entitled, including all lost wages and benefits, past and future, in whatever amount she is found to be entitled;

d.     Award Plaintiff compensatory damages for monetary and nonmonetary loss in whatever amount she is found to be entitled;

e.     Award Plaintiff exemplary and punitive damages in whatever amount she is found to be entitled;

f.     Award Plaintiff reasonable attorney's fees, costs, and interests; and

g.     Award such other relief as this Court deems just and proper.

Respectfully Submitted,

HURWITZ LAW PLLC

/s/ *Noah S. Hurwitz*

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWTIZ LAW PLLC
*Attorneys for Plaintiff*
617 Detroit St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
Noah@hurwitzlaw.com

Dated: May 29, 2022

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DANA O'NEAL,

       Plaintiff,                    Case No. 22-cv-10470

v.                                   Hon. Victoria A. Roberts

52ND DISTRICT COURT and
JUDGE JOSEPH G. FABRIZIO,
in his personal and official capacity,

       Defendants.

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Aaron C. Thomas (P55114) |
| Grant M. Vlahopoulos (P85633) | Oakland County Deputy Corp. Counsel |
| HURWITZ LAW PLLC | Nicole B. Tabin (P73685) |
| *Attorneys for Plaintiff* | Sr. Asst. Oakland County Corp. Counsel |
| 617 Detroit St. STE 125 | *Attorneys for Defendants* |
| Ann Arbor, MI 48104 | 1200 N. Telegraph Road, Dept. 419 |
| (844) 487-9489 | Pontiac, MI 48341-0419 |
| noah@hurwitzlaw.com | (248) 975-9616 |
| grant@hurwitzlaw.com | thomasa@oakgov.com |
| | tabinn@oakgov.com |

### **JURY DEMAND**

    Plaintiff DANA O'NEAL, by and through her attorneys, HURWITZ LAW

PLLC, hereby demands a trial by jury of the issues in the above-captioned cause of

action.

                          /s/  *Noah S. Hurwitz*
                          Noah S. Hurwitz (P74063)
                          HURWITZ LAW PLLC
                          *Attorneys for Plaintiff*

Dated: May 29, 2022