# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DANA O'NEAL,

      Plaintiff,                        Case No. 22-cv-10470

v.                                  Hon. Victoria A. Roberts

52ND DISTRICT COURT and
JUDGE JOSEPH G. FABRIZIO,
in his personal and official capacity,

      Defendants.

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Aaron C. Thomas (P55114) |
| Grant M. Vlahopoulos (P85633) | Oakland County Deputy Corp Counsel |
| HURWITZ LAW PLLC | Nicole B. Tabin (P73685) |
| *Attorneys for Plaintiff* | Sr. Asst. Oakland County Corp Counsel |
| 617 Detroit St. STE 125 | *Attorneys for Defendants* |
| Ann Arbor, MI 48104 | 1200 N. Telegraph Road, Dept. 419 |
| (844) 487-9489 | Pontiac, MI 48341-0419 |
| noah@hurwitzlaw.com | (248) 975-9616 |
| grant@hurwitzlaw.com | (248) 858-1475 |
| | thomasa@oakgov.com |
| | tabinn@oakgov.com |

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## MOTION TO DISMISS FIRST AMENDED COMPLAINT

Plaintiff Dana O'Neal, by and through her attorneys, Hurwitz Law PLLC, hereby moves this Court to deny Defendants' Motion to Dismiss Plaintiff's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). In support of her motion, Plaintiff relies on the facts and law within her Brief in Support.

Respectfully submitted,

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
*Attorneys for Plaintiff*
617 Detroit St., Ste. 125
Ann Arbor, MI 48104

Dated: July 14, 2022

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DANA O'NEAL,

       Plaintiff,                 Case No. 22-cv-10470

v.                               Hon. Victoria A. Roberts

52ND DISTRICT COURT and
JUDGE JOSEPH G. FABRIZIO,
in his personal and official capacity,

       Defendants.

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Aaron C. Thomas (P55114) |
| Grant M. Vlahopoulos (P85633) | Oakland County Deputy Corp Counsel |
| HURWITZ LAW PLLC | Nicole B. Tabin (P73685) |
| *Attorneys for Plaintiff* | Sr. Asst. Oakland County Corp Counsel |
| 617 Detroit St. STE 125 | *Attorneys for Defendants* |
| Ann Arbor, MI 48104 | 1200 N. Telegraph Road, Dept. 419 |
| (844) 487-9489 | Pontiac, MI 48341-0419 |
| noah@hurwitzlaw.com | (248) 975-9616 |
| grant@hurwitzlaw.com | (248) 858-1475 |
| | thomasa@oakgov.com |
| | tabinn@oakgov.com |

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................ ii

**STATEMENT OF ISSUES** ............................................................................... iv

**STATEMENT OF CONTROLLING/MOST APPROPRIATE AUTHORITY** v

**INTRODUCTION** ................................................................................................1

**STATEMENT OF FACTS** ................................................................................2

   **I.**  **PLAINTIFF'S AMENDED COMPLAINT HAS SUFFICIENT PLED A PRIMA FACIE CASE OF FIRST AMENDMENT RETALIATION.** ....8

      **A.**  **Plaintiff Engaged in Constitutionally Protected Conduct.**..............8

      **B.**  **A Causal Connection Exists Between Plaintiff's Constitutionally Protected Conduct and Her Termination.**.......................................20

  **II.**  **PLAINTIFF'S AMENDED COMPLAINT HAS SUFFICIENT PLED A PRIMA FACIE CASE OF MICHIGAN'S WHISTLEBLOWER PROTECTION ACT.** ........................................................................23

 **III.**  **PLAINTIFF CONCEDES THAT HER FIRST AMENDMENT CLAIM AGAINST THE 52ND DISTRICT COURT AND JUDGE FABRIZIO IN HIS OFFICIAL CAPACITY MAY BE DISMISSED PURSUANT TO THE DOCTRINE OF SOVEREIGN IMMUNITY.** ................................24

**CONCLUSION**.................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aquilina v. Wriggelsworth*, 759 F.App'x 340, 344 (6th Cir. 2018)..........................14

*Bohler v. City of Fairview, Tennessee*, 429 F. Supp. 3d 477, 487 (M.D. Tenn. 2019) ........................................................................................................ 15, 19

*Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015)..........................................13

*Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019)........................... 20, 25

*Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 574 (6th Cir. 1997) ...................................................................................................... 12, 15

*Connick v. Myers*, 461 US 138, 148 (1983)............................................... 1, 10

*Debano-Griffin v. Lake Cnty.*, 493 Mich. 167, 175, 828 N.W.2d 634, 638 (2013) 24

*Devlin v. Kalm*, 531 F. App'x 697, 704 (6th Cir. 2013) ..........................................9

*Dixon v. Gonzales*, 481 F.3d 324, 445 (6th Cir. 2007)..........................................21

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012)...............11

*Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004) ...............................................11

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .................................................. 8, 13, 20

*Garvin v. Detroit Bd. of Educ.*, 2013 WL 951118 at *11 (Mich. Ct. App. Feb. 26, 2013) .................................................................................................................15

*Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012) ... passim

*Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir. 2007 ............................18

*Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) ........................7

*Housey v. Macomb Cnty.*, 534 F. App'x 316, 321 (6th Cir. 2013) .........................11

*Johnson v. Lincoln Univ. of Com. Sys. of Higher Educ.*, 776 F.2d 443, 451 (3d Cir. 1985) ................................................................................................................13

*Ladach v. City of Romulus*, 2018 WL 5077181 at *8 (E.D. Mich. Aug. 24, 2018) 18

*Lane v. Franks*, 573 U.S. 228, 241 (2014)................................................ 9, 13, 15, 20

*Marohnic v. Walker*, 800 F.2d 613 (6th Cir. 1986) .................................................10

*Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 469 (6th Cir. 2017) ... 12, 13

*McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973) ......................................24

*Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010) ........................................ 8, 20

*Paterek v. Vill. of Amada, Mich.*, 801 F.3d 630, 646 (6th Cir. 2015) ....................20

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968 ....................................................................................................20

*Poe v. Haydon*, 853 F.2d 418, 422 (6th Cir. 1988)...................................... 2, 8, 25

*Pucci v. Nineteenth Dist. Court*, 628 F.3d 752 (6th Cir. 2010).............. 1, 12, 17, 24

*Rodgers v. Banks*, 344 F.3d 587, 597 (6th Cir. 2003) ...............................................9

*Romero v. City of Middletown*, 2020 WL 4784669 (S.D. Ohio Aug. 18, 2020)....12, 18

*Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503, 513 (6th Cir. 2020) .........8

*Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994) ....................................19

*Wood v. 36th Dist. Ct.*, 2021 WL 1085267, at *4 (E.D. Mich. Mar. 22, 2021), *aff'd*, 2022 WL 500654 (6th Cir. Feb. 18, 2022) ..........................................................16

## STATEMENT OF ISSUES

I.   Whether Plaintiff's Count I (First Amendment Retaliation) should be dismissed where (1) Plaintiff's speech was a matter of public concern; (2) Plaintiff spoke as a private citizen; and (3) there is a causal connection between Plaintiff's termination and her speech.

Plaintiff's answer: NO

II.  Whether Plaintiff's Count II (Violation of Michigan's Whistleblower Protection Act) should be dismissed when the Amended Complaint pleads allegations that establish a causal connection between the protected activity and Plaintiff's termination.

Plaintiff's answer: NO

III. Whether Chief Judge Fabrizio in his personal capacity is entitled to dismissal pursuant to the doctrine of sovereign immunity.

Plaintiff's answer: NO

## <u>STATEMENT OF CONTROLLING/MOST APPROPRIATE AUTHORITY</u>

Plaintiff identified the following as the most controlling and most appropriate authorities:

Fed. R. Civ. P. 12(b)(6).

*Aquilina v. Wriggelsworth*, 759 F.App'x 340 (6th Cir. 2018).

*Connick v. Myers*, 461 U.S. 138 (1983).

*Lane v. Franks*, 573 U.S. 228 (2014).

## **INTRODUCTION**

Ms. O'Neal, former Court Administrator of the Oakland County 52-4 District Court, alleges that the 52nd District Court and Chief Judge Fabrizio violated the First Amendment and Michigan's Whistleblower Protection Act by terminating her for asserting protected speech concerning judicial misconduct within the court.  (FAC ¶ 1.  Plaintiff's protected speech precipitated an official investigation by the Judicial Tenure Committee ("JTC"), during which she further cooperated with the JTC to the dismay of Chief Judge Fabrizio.  Defendants' Motion attacks bits and pieces of Plaintiff's Amended Complaint in order to cast doubt on whether Plaintiff's protected speech was truly a matter of public concern.  But Defendants' argument falls short because Plaintiff's protected speech addressed matters of larger societal importance that impacted public stakeholders because "public confidence in the judiciary is eroded by irresponsible and improper conduct by judges" (MI. Code of Judicial Conduct, Canon 2A).  And the outpouring of public support for Plaintiff once news of her termination spread supports the proposition that Plaintiff "brought to light potential or actual wrongdoings or a breach of the public trust are generally matters of public concern." *Connick v. Myers*, 461 US 138, 148 (1983).

As a threshold matter, Plaintiff concedes that the Sixth Circuit's holding in *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752 (6th Cir. 2010) compels dismissal of her First Amendment Retaliation claim (Count I) against the 52nd District Court and

Chief Judge Fabrizio in his *official capacity*.  However, because "an official 'may be held personally liable for an allegedly unlawful action . . . of the legal rules that were clearly established at the time it was taken" (*Poe v. Haydon*, 853 F.2d 418, 422 (6th Cir. 1988)), Plaintiff can still prosecute her claims against Chief Judge Fabrizio in his personal capacity.

## STATEMENT OF FACTS

Plaintiff had over twenty-five years of experience working for Oakland County when she was hired as the Court Administrator for the Fourth Division of the 52nd District Court in April 2018.  (ECF No. 9, PageID. 97; First Amended Complaint "FAC" ¶¶ 15-19.)  The Fourth Division encompasses the cities of Troy and Clawson and employs Judge Kristen Hartig and Judge Maureen McGinnis.  In the years prior to Plaintiff's arrival, several former court administrators working at the Oakland County 52-4 District Court abandoned their positions due to Judge Hartig's mistreatment of staff and the public.  (FAC ¶ 23.)  One of Plaintiff's predecessors resigned within six weeks of Judge Hartig assuming the bench.  (FAC ¶ 25.)  Another predecessor retired after alleging a hostile work environment, which triggered an investigation by the Oakland County Human Resources Department in 2016.  (FAC ¶ 26.)  That investigation resulted in Human Resources claiming it could not control Judge Hartig's behavior and required staff to take a mandatory training entitled "How to Deal with Difficult People."  (FAC ¶ 27.)

During Plaintiff's tenure at the Oakland County 52-4 District Court, Plaintiff was objectively successful, leading efforts to recruit and retain staff for the County, improving operations and building securities, increasing staff morale, remedying labor shortages, solving a black mold issue, and implementing COVID-19 safety policies and procedures.  (FAC ¶ 28.)  However, Judge Hartig continuously exerted inappropriate control over court administration, thereby usurping Plaintiff's supposedly autonomous role.  (FAC ¶ 29.)  Judge Hartig forced Plaintiff to attend daily closed-door meetings where Plaintiff was regularly berated by Judge Hartig, who claimed she was "above" Plaintiff.  (FAC ¶ 30.)  Judge Hartig told Plaintiff about a new "Court Administrator Absence Policy," designed by Judge Hartig to limit employee medical leave.  (FAC ¶¶ 35, 40.)  Plaintiff forwarded an electronic copy of the policy to Chief Judge Fabrizio and to the Oakland County 52-1 District Court Administrator, who responded, "[I]s this [expletive] for real?" (FAC ¶ 41.) Plaintiff witnessed Judge Hartig mistreat other employees and members of the public from the outset of her employment.  (FAC ¶ 31.)  Plaintiff received multiple complaints from court appointed counsel, took notes on Judge Hartig's impropriety toward county employees and members of the public, and watched video recordings of Judge Hartig's malevolent conduct.  (FAC ¶¶ 32-34.)

In September 2018, Judge Hartig hailed Plaintiff to open court and accused her of mismanaging grant funding.  (FAC ¶ 43.)  A full court room watched Judge

Hartig publicly humiliate Plaintiff.  (FAC ¶ 43.)  Plaintiff thereafter reported the incident to Chief Judge Fabrizio, who escalated the matter to SCAO, including both a transcript and video recording of the September 2018 incident.  In March 2020, Plaintiff emailed Chief Judge Fabrizio more examples of Judge Hartig's behavior, whereupon Chief Judge Fabrizio referred Plaintiff to Human Resources.  (FAC ¶¶ 46-47.)  Human Resources interviewed Plaintiff for three hours.  (FAC ¶ 48.)  At the conclusion of its investigation, Human Resources created a report containing its findings on Judge Hartig's conduct that was based in part on Plaintiff's protected speech.  (FAC ¶ 49.)  Only Chief Judge Fabrizio received a copy of the report.  (FAC ¶ 49.)  Human Resources concluded that Judge Hartig's behavior fostered a "hostile work environment."  (FAC ¶53.)

Human Resources then recommended that Chief Judge Fabrizio forward the report to JTC and submit a request for investigation.  (FAC ¶ 53.)  The JTC is the arm of Michigan's judicial branch created pursuant to Mich. Const. Art VI, Sec. 30 to investigate allegations of judicial misconduct.  (FAC ¶ 54.)  On or around June 30, 2020, the JTC initiated an investigation into whether Judge Hartig engaged in misconduct, again based on Plaintiff's speech.  (FAC ¶ 59.)  Plaintiff's speech was unrelated to the management, operation, or general business administration of the 52nd District Court.  (FAC ¶ 61.)  As the JTC investigation progressed, Plaintiff provided names of individuals to be interviews.  (FAC ¶ 72.)  In November 2020,

the JTC interviewed current and former County employees, local law enforcement and local attorneys.  (FAC ¶ 73.)  The JTC investigator interviewed 40-60 people on subjects that were far beyond the scope of how Plaintiff was treated.  (FAC ¶ 74.)

In early 2021, Chief Judge Fabrizio instructed Court Administrator Alex Black to call Plaintiff and tell her to stop contacting him because he did not know "why or how to assist" Plaintiff.  (FAC ¶ 75.)  When Plaintiff asked why Chief Judge Fabrizio would not contact her personally, Ms. Black claimed that Chief Judge Fabrizio did not want to "upset" Plaintiff.  (FAC ¶ 76.)  On September 13, 2021, Plaintiff was called to a meeting with Judge McGinnis and Chief Judge Fabrizio. (FAC ¶ 79.)  During the meeting, Chief Judge Fabrizio asked Plaintiff whether someone within the court was contacting potential candidates to tell them "how bad it was" working for Defendant 52nd District Court.  (FAC ¶ 80.)

The "General Summary" of Plaintiff's job description provides:

> Under general direction, is responsible for the *administrative and non-judicial functions* of one division of the 52nd District Court involving the management of case processing, personnel, budget, juries, facilities, security and other non-judicial functions.  Directs the processing of traffic, civil, criminal and probation case flow.  Reviews and implements new court rules, statues, administrative orders and laws affecting case processing, technical and personnel matters.  Utilizes current county-wide and/or department specific software to complete assignments.

(FAC ¶ 60.) (**Ex. 1**, Plaintiff's Job Description.)  Plaintiff's speech brought to light the wrongdoings or a breach of the public trust in 52nd District Court and in Chief Judge Fabrizio.  (FAC ¶ 62.)  Plaintiff did not, nor could she, gain any personal advantages by asserting her speech.  (FAC ¶ 64.)  Plaintiff's job description and her essential functions do not involve the responsibility to curtail a judge's behavior. (FAC ¶¶ 65-66.)

Plaintiff's speech was echoed by public sentiment.  Oakland County residents recognize that the 52nd District Court is "rife with judicial abuse and misconduct." (FAC ¶ 88.)  On June 8, 2021, Dr. Samantha Hallman appeared before the Oakland County Board of Commissioners Public Health and Safety Committee.  (FAC ¶ 88.) Dr. Hallman commented, "[t]here has been a pattern of abuse from [Defendant 52nd District Court] for years and that it is well known in the legal community.  However, it is not well known among the general public who votes for these judges and pays for these courts because of judicial orders in place that are designed to prevent the public from accessing copies of audio and video files that would let them see and hear for themselves what's been going on for years."  (FAC ¶ 89.)

Plaintiff managed staffing shortages caused by the COVID-19 pandemic. (FAC ¶¶ 81-83.)  Plaintiff mitigated the issues by hiring new employees and instilling cross-training programs, where employees from other departments and/or divisions of Defendant 52nd District could fill any openings when help was required.

6

(FAC ¶ 84.)  While Plaintiff solved the administrative issues posed by the COVID-19 pandemic that crippled *all* Michigan courts, Defendants never indicated that Plaintiff's performance was subpar.  (FAC ¶¶ 86-87.)  After never being previously disciplined by Chief Judge Fabrizio, Defendants terminated Plaintiff on December 10, 2021 while the JTC investigation remained open.  (FAC ¶ 89.)  No justification for termination was provided.  (FAC ¶ 92.)

## STANDARD OF REVIEW

To survive a motion pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise relief above the speculative level." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012).  "[A] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable of the misconduct alleged." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009). This Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable references in favor of the plaintiff." *Handy-Clay*, 695 F.3d at 538.

## ARGUMENT

Plaintiff's claims for unlawful termination in violation of the First Amendment and Michigan's WPA against Chief Judge Joseph G. Fabrizio in his personal capacity can proceed because "an official 'may be held personally liable

for an allegedly unlawful action . . . of the legal rules that were clearly established at the time it was taken" *Poe*, 853 F.2d at 422.   Chief Judge Fabrizio flouted prohibitions of the First Amendment and the WPA when he terminated Plaintiff in retaliation for her protected criticisms of his court.

## I.   PLAINTIFF'S AMENDED COMPLAINT HAS SUFFICIENT PLED A *PRIMA FACIE* CASE OF FIRST AMENDMENT RETALIATION.

The First Amendment prohibits state actors from "abridging the freedom of speech" (U.S. Const. Amend. I) and "protects the right of an ordinary citizen to criticize public officials . . . without fear of criminal or civil repercussions." *Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503, 513 (6th Cir. 2020).   Plaintiff must show that: (1) she engaged in protected conduct; (2) Defendants took adverse action against her; and (3) a causal connection exists between the protected activity and the adverse action. *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010).

### A.   Plaintiff Engaged in Constitutionally Protected Conduct.

There is a three-step inquiry to determine whether speech by a public employee is protected.   Plaintiff's speech must address a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410 (2006).   Plaintiff must speak as a private citizen and not as an employee pursuant to her official duties.   *Id*.   Finally, courts balance the interests of the parties and ask whether "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public" based on the government's needs as an employer.   *Id*. at 418.

### 1.    Plaintiff spoke on a matter of public concern.

"Speech involves matters of public concern when it can be fairly considered as relating to [1] any matter of political, social, or other concern to the community, or [2] when it is a subject of legitimate news interest; that is, subject of general interest and value of concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014).  An employee's speech is protected "as long as some portion of the speech" addresses a matter of public concern. *Rodgers v. Banks*, 344 F.3d 587, 597 (6th Cir. 2003).  Defendants' Motion attempts to circumvent the actual content of Plaintiff's speech at issue in this case—namely, Plaintiff reporting of Judge Hartig's judicial misconduct and Plaintiff's participation in the JTC investigation.    Instead, Defendants "subdivide" Plaintiff's speech without acknowledging the "overall context" of the speech to cast doubt on whether the speech addressed matters of public concern.  *See Devlin v. Kalm*, 531 F. App'x 697, 704 (6th Cir. 2013) ("[S]ubdividing [the speaker's] comments and attacking them without reference to their overall context is not the proper way to analyze whether those statements address matters of public concern.").

As the Michigan Code of Judicial Conduct declares, "[p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges."  MI. Code of Judicial Conduct, Canon 2(A).  Plaintiff's Amended Complaint illustrates that Plaintiff's speech triggered a JTC investigation into whether Judge Hartig engaged

in the sort of "improper conduct" prohibited by the Code. FAC ¶¶ 46-53, 59. Plaintiff's speech is beyond reproach where "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Marohnic v. Walker*, 800 F.2d 613 (6th Cir. 1986).

In *Connick*, the United States Supreme Court held that speech involving matters of public concern included statements "inform[ing] the public that [a governmental entity] was not discharging its governmental responsibilities" or statements "seek[ing] to bring to light actual or potential wrongdoing or breach of public trust on the part of" government employees. 461 U.S. at 148. That is what Plaintiff's speech accomplished. Plaintiff's speech concerned how an elected judge irresponsibly mistreated members of the public *and* staff so severely that it potentially constituted judicial misconduct. Plaintiff's speech brought to light wrongdoings by the 52nd District Court and Chief Judge Fabrizio as its chief judge for harboring Judge Hartig's misconduct. FAC ¶¶ 31, 33, 46, 62, 108.

*Connick* held that protected speech included anything that could "fairly be considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 147-48. Plaintiff's speech fell outside of her job duties, concerned a judge's impropriety, triggered a formal JTC investigation, and unequivocally related to matters of "political, social, or other concern" to the public. And Defendants unlawfully terminated her to "chill or silence a person of ordinary

10

firmness from future First Amendment activities." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012).

It is noteworthy that Plaintiff's speech went beyond the mere "employee grievance[s] concerning internal office policy" described in *Connick*. Plaintiff's job duties did not require her to monitor judicial behavior. Rather, Plaintiff's speech rose to the level of affecting the public at large since her communications were with public entities (SCAO and JTC). *See Housey v. Macomb Cnty.*, 534 F. App'x 316, 321 (6th Cir. 2013) (the Sixth Circuit concluded that a Probate Court Register's reports and communications to the SCAO about alleged attorney and judicial misconduct were a matter of public concern). The public revelation that an elected judge engaged in judicial misconduct for years and that Defendants were cognizant of it logically "involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004). It matters here that (a) the public's tax dollars pay for JTC investigations, FAC ¶ 70; and (b) members of the public elect the district court judges. FAC ¶ 95. Of course, it is also significant that Plaintiff's speech caused the JTC to interview at least 40-60 individuals consisting of current and former County employees, local law enforcement and local attorneys. FAC ¶¶ 73, 74. The topics of the investigation (and Plaintiff's speech) went well beyond how Plaintiff was treated.

11

However, Defendants argue that Plaintiff's speech is distinguishable from the court administrator public speech that justified a retaliation claim against a judge in *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 768 (6th Cir. 2010) because she did not allege unlawful discrimination.  The argument fails because "[c]onduct does not have to be illegal for it to be a matter of public concern."  *Romero v. City of Middletown*, 2020 WL 4784669 (S.D. Ohio Aug. 18, 2020) (**Ex. 2**); (citing *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 469 (6th Cir. 2017).

Defendants also suggest that the content, form, and context of Plaintiff's speech is not a public concern because of her alleged personal motives for speaking, claiming, "[w]hile it is understandable that Plaintiff and other court employees regard working an environment where they are not demeaned and belittled by a judge to be very important, the issue simply does not rise to the level of affecting the general public at large."  ECF No. 12, PageID.145.  Defendants only speculate about Plaintiff's motives, so the argument has no merit.  More importantly here, personal motives have no bearing in the determination of whether the content, form, and context of Plaintiff's speech is a matter of public concern.  "Indeed, the argument that an individual's *personal* motives for speaking may dispositively determine whether that individual's speech addresses a matter of public concern is plainly illogical and contrary to the broader purposes of the First Amendment."  *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 574 (6th Cir. 1997); *Johnson*

*v. Lincoln Univ. of Com. Sys. of Higher Educ.*, 776 F.2d 443, 451 (3d Cir. 1985) (that a statement originates from a personal dispute does not preclude it touching upon matters of public concern).   Moreover, Defendants overlook that Plaintiff's speech impacted countless public stakeholders, including litigants and voters—not just court staff.  FAC ¶¶ 31, 33, 88.

### 2. Plaintiff spoke as a private citizen.

*Garcetti* held that speech "pursuant to the employee's official duties" (*i.e.*, "employee-speech") is unprotected.  *Garcetti*, 547 U.S. at 413.  More recently, *Lane* modified *Garcetti*'s "official duties" language by adding the term "ordinary."  573 U.S. at 240.  Hence, Defendants must show that the speech at issue related to the employee's *ordinary* job responsibilities for it to fall outside First Amendment. "After *Lane*, the *Garcetti* exception to First Amendment protection for speech . . . must be read narrowly as speech that an employee made *in furtherance of the ordinary responsibilities of his employment*."  *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015).  The Supreme Court's adding of the word "ordinary" was to "avoid transforming broad swaths of speech by employees into unprotected employee-speech simply because it concerned the speaker's public employment." *Mayhew*, 856 F.3d at 456.  But, "[d]Determining whether an employee speaks as a private citizen or as a public employee can be challenging" since there is no "comprehensive framework for defining the scope of an employee's duties," so "the

inquiry is a practical one." *Id.* at 464.  The court should ask "who, where, what, when, why, and how." *Id.*  Also, the Sixth Circuit in *Aquilina v. Wriggelsworth* added several "factors to consider," including: (1) the impetus for the speech; (2) the setting of the speech; (3) the speech's audience; and (4) the general subject matter. *Aquilina v. Wriggelsworth*, 759 F.App'x 340, 344 (6th Cir. 2018).

In *Aquilina*, a judge engaged in citizen-speech (as opposed to employee-speech) when she permitted a reporter to view a video of a criminal defendant attacking an assistant prosecutor during trial. *Id*. at 344-45.  The *Aquilina* plaintiff engaged in citizen-speech because it was "plausible that [she] was concerned as a citizen as well and thought other citizens should know that armed attacks could occur in courtroom," even though "she was probably particularly concerned about court security because of her position as judge." *Id*. at 344.  Similarly, the court largely gave weight to the third factor, the audience, because the reporter's involvement resulted in a public audience for the video. *Id*. at 345.  Here, Plaintiff's speech passes muster under all of the *Aquilina* factors.  Plaintiff did not merely raise internal complaints about Judge Hartig's behavior toward her personally, but instead the complaints were external and fell outside her job duties.  The nature of the JTC investigation itself did not stand to benefit Plaintiff.  A finding from the JTC that Judge Hartig engaged in judicial misconduct would have societal importance and be reported to voters responsible for placing Judge Hartig back on the bench—

something fundamental to First Amendment protection. *Chappel*, 131 F.3d at 577 ("The First Amendment was fashioned to assure the unfettered interchange of ideas and free and open debate vital to informed decision making by the electorate.").

In addition, even if Plaintiff's speech relates to her employment, it does not mean it is employee-speech. "The mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into an unprotected utterance." *Bohler v. City of Fairview, Tennessee*, 429 F. Supp. 3d 477, 487 (M.D. Tenn. 2019) (quoting *Lane*, 573 U.S. at 240). Defendants' Motion fails to acknowledge the point in *Lane* that "speech made by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 240; *see also Garvin v. Detroit Bd. of Educ.*, 2013 WL 951118 at *11 (Mich. Ct. App. Feb. 26, 2013) (**Ex. 3**) ("When a public employee speaks on a matter that is merely related to the employee's profession, he or she is a member of the community most likely to have an informed and definite opinion and must be permitted to speak freely absent fear of retaliation.") Therefore, that Plaintiff learned of Judge Hartig's judicial misconduct as result of her employment is not dispositive.

Defendants also argue that Plaintiff's job duties, specifically "efforts to recruit and retain staff . . . improved operation and building securities, increased staff

morale, and remedied labor deficiencies" prompted her speech. ECF No. 12, PageID.141. That is false. Plaintiff's job duties were far removed from Plaintiff's speech on Judge Hartig's conduct and the failings of Chief Judge Fabrizio to rein in her behavior. In fact, Plaintiff's job description is facially void of any references to "investigate," "report" or "discipline" of employees. Ex. 1; FAC ¶ 66. And, of course, Plaintiff's job description does not include any responsibility for curtailing a judge's behavior. FAC ¶ 65.

This case is also distinguishable from *Wood v. 36th Dist. Ct.*, 2021 WL 1085267, at *4 (E.D. Mich. Mar. 22, 2021), *aff'd*, 2022 WL 500654 (6th Cir. Feb. 18, 2022) (**Ex. 4**). *Wood* held that a Chief Magistrate Judge spoke as an employee of the 36th District when she "allegedly reported to other magistrates and the then-Chief judge that she believed the 36th District's practices surrounding warrants and felony arraignments violated state and federal law." *Id*. at *1. The *Wood* employee met with other magistrate judges and court personnel to discuss litigation concerning those violations, rending the allegations "employee-speech." But the *Wood* employee's Chief Magistrate Judge job description is different from Plaintiff's job description. Ms. Wood "advised the then-Chief Judge, her supervisor, of issues she observed that she believed violated Michigan state and federal laws"; "created written guidance and training materials on topics like how to conduct proper arraignments"; and "worked in that role to address potential legal and civil rights

violations she observed." *Id*.  Judge Wood's ordinary job responsibilities were to actively search for, discuss, educate, and create guidelines on state and federal legal and civil rights violations.  *Id.*  Plaintiff's job duties, on the other hand, did not require her to apprise Chief Judge Fabrizio (or any judge) about judicial misconduct. Plaintiff was instead tasked with creating "reports . . . on revenues and expenditures." *Id*.  Plaintiff had to prepare "reports and other documents related to the court operations for the County and the [SCAO]," but those reports had nothing to do with judicial misconduct.  Moreover, Chief Judge Fabrizio never instructed Plaintiff to report Judge Hartig's judicial misconduct to him as part of her administrative duties. In fact, the opposite is true.  Chief Judge Fabrizio referred Plaintiff to Human Resources because he did not know "why or how to assist" her.  FAC ¶¶ 47, 75. Likewise, Judge McGinnis—the other judge presiding in the 52-4 District Court— did not compel Plaintiff to interfere with Judge Hartig's conduct.  FAC ¶ 39. Plaintiff asserted her speech solely as a concerned citizen when others failed to act on behalf of the public despite their awareness of Judge Hartig's uncouth behavior.

Similar to the public employees in *Pucci* and *Handy-Clay*, Plaintiff's comments were "extraordinary rather than everyday communication."  *Pucci*, 628 F.3d at 768 (6th Cir. 2010) (determining that court administrator's complaints about a judge's unlawful conduct was not part of her official duties); *see also Handy-Clay*, 695 F.3d at 542 (6th Cir. 2012) (holding that a public employee spoke as a citizen

because her speech was directed to individuals inside and outside of her department; and her comments were extraordinary rather than everyday communications). Defendants mischaracterize *Mayhew* when they allege that the case rejected the *Pucci* court's holding that "extraordinary" speech cannot encompass "ordinary job responsibilities." ECF No. 12, PageID. 143. In fact, *Mayhew* does not cite to *Pucci* or discuss the idea of "extraordinary" speech and other post-*Mayhew* cases hold that "extraordinary speech" cannot constitute employee-speech. *See Ladach v. City of Romulus*, 2018 WL 5077181 at *8 (E.D. Mich. Aug. 24, 2018) (**Ex. 5**); *Romero*, 2020 WL 4784669 (S.D. Ohio Aug. 18, 2020) (**Ex. 2**).

The cases cited by Defendants to support the "employee-speech" argument involve issues of typical "employee beefs" pertaining to the speaker's employment. But Plaintiff clearly alleges that her speech was more than "the quintessential employee beef: management has acted incompetently." *Handy-Clay*, 695 F.3d at 540 (6th Cir. 2012) (citing *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir. 2007)); *Cf. Mayhew*, 856 F.3d at 466 (holding that an employee who raised concerns regarding promotions engaged in employee-speech when he made complaints up the chain of command). Plaintiff's speech focused on the misconduct and personal attributes of an elected official—not her job prospects like in the cases cited by Defendant. Moreover, Defendants rely on cases decided at the summary judgment stage—but it is premature to construe any inferences against Plaintiff at this juncture.

18

Finally, this is not a chain of command issue.  The "chain of command" argument has limited use here where there was "interagency cooperation."  *Bohler*, 429 F. Supp. 3d at 488.  Plaintiff's speech required interagency cooperation because the 52nd District Court and JTC are part of Michigan's "One Court of Justice."  It is critical that Plaintiff spoke regarding Judge Hartig's behavior not just within her division of the 52nd District Court, but to Human Resources for the court as a whole and the JTC.  FAC ¶ 48.  Speech outside the chain of command is less likely to be within an employee's ordinary job responsibilities.  *Handy-Clay*, 695 F.3d at 542-43.  Here, Plaintiff's speech was so far outside her job duties that Human Resources told Chief Judge Fabrizio to escalate its report to the JTC and file a Request for Investigation where Plaintiff was not even named as the complainant.  FAC ¶ 49.

### 3.    Balancing Test

The third step is for this Court "to consider whether an employee's comments meaningfully interfere with the performance of [his] duties, undermine a legitimate goal or mission of the employer, create disharmony among coworkers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees."  *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994).  The inquiry therefore asks whether "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public" based on the government's needs as an employer.  *Garcetti*, 547 U.S.

at 418 (discussing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.,
Illinois*, 391 U.S. 563, 568 (1968)).  However, as the Supreme Court has explained
in cases involving allegations of official misconduct, "the employer's side of the
*Pickering* scale is entirely empty." *Lane*, 573 U.S. at 242.  As such, Defendants state
no justification for treating Plaintiff differently in their Motion.

> **B.   A Causal Connection Exists Between Plaintiff's Constitutionally
> Protected Conduct and Her Termination.**

Causation is best addressed by determining: (1) whether the adverse action
was proximately caused by a defendant's acts; and (2) whether the defendant was
motivated by a desire to punish the plaintiff for the exercise of a constitutional right.
*Paterek v. Vill. of Amada, Mich.*, 801 F.3d 630, 646 (6th Cir. 2015).  "The true object
of this inquiry is to determine whether the plaintiff has been retaliated against as a
direct result of his or her protected speech." *Id.*

To establish a causal connection, Plaintiff must allege facts that demonstrate
her speech was "a substantial or motivating factor in the employer's decision to take
the adverse employment action against her." *Handy-Clay*, 695 F.3d at 545 (6th Cir.
2012).  Critically, the Sixth Circuit recognizes that "[a] defendant's motivation for
taking action against the plaintiff is usually a matter best suited for the jury."
*Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019) (quoting *Paige*, 614
F.3d at 282 (6th Cir. 2010)).  And while Defendants' Motion focuses on temporal
proximity, "a mere lapse in time between the protected activity and the adverse

20

employment action does not inevitably foreclose a finding of causality." *Dixon v. Gonzales*, 481 F.3d 324, 445 (6th Cir. 2007). Here, given the JTC investigation had not concluded, it is too early to foreclose any causation argument. Especially viewed in a light most favorable to Plaintiff, the chronology of events alleged on the face of Plaintiff's Amended Complaint supports an inference that her termination was motivated by her protected speech regarding judicial misconduct.

Specifically, Plaintiff's Amended Complaint recognizes that Judge Hartig's conduct was well-known throughout the 52nd District Court and by Chief Judge Fabrizio prior to Plaintiff's hire. FAC ¶¶ 25-27. Regardless, Defendants and Judge McGinnis let the behavior continue regardless of other Court Administrators quitting and the effect of Judge Hartig's behavior on the public. *Id*. Plaintiff observed Judge Hartig's impropriety from the start of her employment as Court Administrator. FAC ¶ 31. And while Plaintiff was on the receiving-end of Judge Hartig's behavior at times, Plaintiff endured the mistreatment and continued to serve Oakland County at the same high-level that she did for over 20 years. Eventually everything would catch up with her. After receiving no informal or formal discipline from Chief Judge Fabrizio, she was only terminated after reporting to Chief Judge Fabrizio her concerns about Judge Hartig (FAC ¶ 46) and then engaging with JTC after Chief Judge Fabrizio to do so himself. FAC ¶¶ 50, 51. Then curiously on June 4, 2020, Defendants executed LAO 2020-04, which cuts off public access and reproduction

to court records (including videos and transcripts) of Judge Hartig's in-court conduct. **Ex. 6**, LAO 2020-04. The timing is hard to ignore. Defendants cannot dispute that Chief Judge Fabrizio signed LAO 2020-04 after Plaintiff blew the whistle on Judge Hartig's potential misconduct. *Id*. This fact alone implies Defendants sought to conceal Judge Hartig's behavior from the public in advance of a formal JTC investigation. Defendants' statement that they are "unclear" how it relates to Plaintiff's claims strains credulity. ECF No. 12, PageID. 130.

In addition, after Plaintiff's protected speech, Chief Judge Fabrizio began distancing himself from Plaintiff. FAC ¶ 75. In early 2021, Chief Judge Fabrizio instructed Ms. Black to tell her to stop contacting him because he did not know "why or how to assist" Plaintiff. FAC ¶ 75. Chief Judge Fabrizio claimed he did not want to "upset" Plaintiff, which could be interpreted as being fed up with her complaints and protected speech. FAC ¶ 76.

Meanwhile, residents of Oakland County caught on to the potential misconduct occurring within the 52nd District Court. FAC ¶ 88. On June 8, 2021, a resident of Oakland County, Dr. Hallman, warned the Oakland County Board of Commissioners Public Health and Safety committee that "[t]here has been a pattern of abuse from [52nd District Court] for years" and the public "who votes for these judges and pays for these courts" is prevented "from accessing copies of audio and video files that would let them see and hear for themselves what's been going on for

years" because of Defendants' LAO 2020-04. FAC ¶ 88.  Then Chief Judge Fabrizio and Judge McGinnis called Plaintiff into a meeting on September 13, 2021 to question her as to whether someone within the court was contacting potential candidates to tell them "how bad it was" working for Defendant 52nd District Court. FAC ¶ 80.  Similarly, in September 2021, Plaintiff learned that the JTC report was being finalized.  FAC ¶ 77.

More evidence of Defendants' pretextual motive for Plaintiff's termination is that Defendants never indicated that her performance fell below expectations or standards during her entire tenure as Court Administrator of the 52-4 District Court. FAC ¶ 87.  Here, Defendants do not produce any evidence that Plaintiff's job performance was unsatisfactory.  Yet, Defendants inexplicably terminated Plaintiff on December 10, 2021.  FAC ¶ 89.  The bottom line is that Plaintiff's Amended Complaint establishes a causal connection between Plaintiff's protected speech and her termination—enough to warrant discovery on the topic.

## II.  PLAINTIFF'S AMENDED COMPLAINT HAS SUFFICIENT PLED A *PRIMA FACIE* CASE OF MICHIGAN'S WHISTLEBLOWER PROTECTION ACT.

Plaintiff may establish a *prima facie* case under Michigan's Whistleblower Protection Act by showing that (1) she engaged in protected activity as defined by the act, (2) Defendants took an adverse employment action against Plaintiff, and (3) a causal connection exists between the protected activity and the adverse

employment action.  MCL 15.362; *Debano-Griffin v. Lake Cnty.*, 493 Mich. 167, 175, 828 N.W.2d 634, 638 (2013).  Defendants failed to argue the first and second elements of Plaintiff's WPA claim, therefore the only issue is establishing a causal connection between Plaintiff's protected activity and her termination.

"Because whistleblower claims are analogous to other antiretaliation employment claims brought under employment discrimination statutes prohibiting various discriminatory animuses, they should receive treatment under the standards of proof of those analogous claims."  *Id*. at 175-76.  Specifically, this case will require an application of the burden-shifting framework set forth in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973) upon a finding from this Court that Plaintiff established a *prima facie* case under the WPA.  Plaintiff may "present a rebuttable *prima facie* case on the basis of proofs from which a factfinder could *infer* that the [P]laintiff was the victim of unlawful retaliation."  *Debano-Griffin*, 493 Mich. at 638.  *See* Section I(B), *supra*.

### III.   PLAINTIFF CONCEDES THAT HER FIRST AMENDMENT CLAIM AGAINST THE 52ND DISTRICT COURT AND JUDGE FABRIZIO IN HIS OFFICIAL CAPACITY MAY BE DISMISSED PURSUANT TO THE DOCTRINE OF SOVEREIGN IMMUNITY.

Plaintiff concedes that her First Amendment Retaliation claim (Count I) against the 52nd District Court and Chief Judge Fabrizio in his official capacity can be dismissed pursuant to the Sixth Circuit's holding in *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752 (6th Cir. 2010).  But "whether an official 'may be held

personally liable for an allegedly unlawful action generally turns on the objective legal reasonableness of the action, addressed in light of the legal rules that were clearly established at the time it was taken." *Poe*, 853 F.2d at 422. *Pucci* and its progeny very clearly establish that Plaintiff's conduct was constitutionally protected for the aforementioned reasons and that her termination in retaliation for her conduct was a violation of her First Amendment rights. Moreover, this Court has repeatedly cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Buddenberg*, 939 F.3d at 738 (6th Cir. 2019). "Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Id*. at 433-34. Accordingly, Chief Judge Fabrizio in his personal capacity is not entitled to qualified immunity with respect to Plaintiff's claims at this stage.

## **<u>CONCLUSION</u>**

For the reasons stated above, Plaintiff respectfully requests this Court deny Defendant's Fed. R. Civ. 12(b)(6) Motion to Dismiss in its entirety.

Respectfully submitted,

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Dated: July 14, 2022          *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2022, I electronically filed the foregoing document with the Clerk of the Court using the ECF System which will send notification of such filing to the attorney(s) of record.

<i>/s/ Noah S. Hurwitz</i>    <br>Noah S. Hurwitz (P74063)